UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHEENA C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19 CV 78 JMB |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On November 7, 2016, plaintiff Sheena C. protectively filed applications for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of November 1, 2014, which she subsequently amended to August 4, 2015.  (Tr. 156-57, 158-64, 165-73, 185).[1] After plaintiff's applications were denied on initial consideration (Tr. 73-84; 85-96), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 104-05).

Plaintiff and counsel appeared for a hearing on July 26, 2018.  (Tr. 35-72).  Plaintiff testified concerning her disability, daily activities, functional limitations, and past work.  The ALJ

---

[1] Prior applications were denied at initial consideration on January 26, 2011.  (Tr. 200).

also received testimony from vocational expert Jennifer LaRue, M.A.  The ALJ issued a decision denying plaintiff's applications on February 2, 2019.  (Tr. 7-29).  The Appeals Council denied plaintiff's request for review on July 26, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in December 1984 and was 30 years old on the amended alleged onset date.  She had a high school diploma and lived with her teenaged daughter.[2]  (Tr. 220, 42).  She previously worked as an aide and program assistant for developmentally-disabled adults.  In addition, she held short-term clerical and sales jobs.  (Tr. 206, 45-47, 66).  She had some employment following her alleged onset date, but it was not performed at the level of sustained gainful employment.  (Tr. 196-98).

Plaintiff listed her disabling impairments as bipolar disorder, fibromyalgia, pulmonary embolism, deep vein thrombosis, back problems, and neck problems.  (Tr. 204).  In her December 2016 Function Report (Tr. 213-20), plaintiff stated that she had a hard time concentrating and became anxious and overwhelmed.  With respect to her physical ailments, plaintiff said that she was slow-moving and could not breathe very well.  Her neck hurt and she had poor range of motion.  Her left side (her dominant side) became numb and she tended to drop things and her left leg gave out.  She had "bad chest pain" and pain "all over" her body.  (Tr. 213).  She spent most of the day in a recliner, watching television.  She could no longer lay in bed because of chest pain and her neck pain kept her awake.  Her pain and breathing difficulties interfered with most aspects of self-care.  She used a shower chair and needed help to wash her hair.  She was able to prepare

---

[2] Plaintiff obtained her high school diploma while attending Job Corps.  (Tr. 428).  In September 2016, she reported that her best friend's daughter was living with her and her daughter.  (Tr. 423).

2

sandwiches and microwave meals for herself but depended on her family to provide complete meals. She no longer did any household chores or yard work. She did not play video games, do puzzles, or use a computer. (Tr. 222). She was able to drive but did not do so very often because it hurt to turn her head. Once a month, she went to the grocery store where she used an electric cart and a family member took items off the shelves for her. She could count change but otherwise was unable to manage financial accounts. When she was manic, she either spent too much money or saved and did not pay her bills. She socialized with people who came to her house to visit or help her. She was in too much pain to leave the house often and was not as outgoing as she used to be. She needed reminders to take care of her grooming and had to set alarms to take her medications. She tried to be respectful of authority figures but had been fired from a job for "tell[ing] them how it is." (Tr. 218). She could pay attention for 5 to 10 minutes. She had to read written instructions several times in order to understand them and did not follow spoken instructions "at all." Id. She responded to stress with worsening anxiety and depression but thought she handled changes in routine "ok." (Tr. 219). Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands. Lifting hurt her back and neck; squatting, bending, and kneeling hurt her back and interfered with her breathing; reaching caused her left arm to go numb; and she had to stand and stretch when sitting. She needed to stop to catch her breath after walking 20 to 30 feet and when climbing stairs. When talking, she ran out of breath and became confused. She forgot a lot and could not focus on one thing. She could finish what she started but it took a long time. Her medications caused sleepiness and dizziness.

3

Plaintiff's mother completed a third-party Function Report.  (Tr. 224-31).  She wrote that she saw plaintiff nearly every day and that they watched television together.  Plaintiff sat in her chair most of the day.  According to her mother, plaintiff slept in her recliner because of chest pain.  She took a long time to complete her grooming because she got out of breath and her mother had to remind her "all the time" to take care of her personal needs and grooming.  Although she used to be able to cook meals, she was now limited to sandwiches and canned soup.  She no longer completed any household chores.  Plaintiff's mother described her as "very good with people," but she no longer went anywhere except to medical visits.  She also stated that plaintiff worried that she was going to die and that her daughter was going to discover her body.

In April 2016, plaintiff's pain medications included the antidepressant amitriptyline, the anticonvulsant Topamax, and the antihistamine hydroxyzine.  She also took the anticoagulant Eliquis; gabapentin for fibromyalgia; duloxetine for depression; lorazepam and diclofenac for anxiety; omeprazole for acid reflux; and zolpidem for sleep.  (Tr. 284).   In May 2018, she was no longer taking hydroxyzine and had switched to pregabalin to treat fibromyalgia.  (Tr. 299).  In July 2018, her pain medications included the opiates tramadol and hydrocodone.  (Tr. 306).

The Field Office interviewer who took plaintiff's applications noted that she was very polite and friendly.  She attempted to answer every question and was able to do so without difficulty.  Her breathing was heavy and labored and she coughed quite a bit.  (Tr. 201).

Plaintiff testified at the July 2018 hearing that she woke up in the morning, took her medication, and then sat in her recliner.  Sometimes she ate breakfast, or showered, or picked up the house a little bit.  (Tr. 53).   She testified that she needed to support her neck at all times and always used a neck pillow when at home.  During the hearing, she leaned her head against her hand.  (Tr. 54).  She was unable to turn her head comfortably and so tried to make sure she had a

4

passenger when she drove to help her look for traffic.  (Tr. 43).  As a result of her back pain, she needed help to get out of her bed, her chair, and the car.  She could not bend over very well or pick up a gallon container.  Her left arm went numb several times a day.  (Tr. 50-51, 57).  She also had frequent numbness in her legs.  Plaintiff's fibromyalgia caused pain all over her body, in addition to the back pain she suffered.  (Tr. 51).  Plaintiff rated her daily pain at levels 7 to 9 on a 10-point scale.  (Tr. 55).  Plaintiff took tramadol and baclofen four times a day and hydrocodone once a day.  The medication made the pain tolerable but, when it was really bad, she took hydrocodone and just went to sleep for four hours.  This occurred several times a week.  (Tr. 55-56).  She was not a good candidate for surgery to treat her pain because she took a blood thinner and had a history of deep vein thrombosis and pulmonary embolism which, in turn, damaged her heart.  Her doctors wanted to try treating her back pain by infusion.  (Tr.  48-49, 55, 59, 61, 283).  She "locked up" quite frequently and was unable to stand until her daughter rubbed out the tight spot.  (Tr. 50).  While her daughter was in school and unavailable to help her, plaintiff "mainly just s[a]t in the same spot."  (Tr. 51).  Her daughter got up and got ready for school on her own and then took the bus to school.  (Tr.  53-54).

Plaintiff testified that she had suffered with depression off and on, but it was worse because of the pain and having to see so many doctors.  She said the doctors "tell you they're going to do this and do that, and then it takes forever, and it just kind of messes with you a little bit."  (Tr. 52).  She had crying spells.  Sometimes her pain triggered panic attacks and caused her to think she was having a heart attack.  (Tr. 58).  She used to be an active person, but now stayed home all the time.  She went to some parent-teacher conferences, did not go to church, and her family came to visit her.

Vocational expert Jennifer LaRue testified that plaintiff's past work as an order taker and office worker was classified as sedentary and semiskilled, while her work as an aide to disabled adults was medium and skilled.  (Tr. 65).  Ms. LaRue was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to sedentary work; who could never use her arms to push or pull or reach overhead but could use her upper extremities to frequently handle and finger objects; who could not use her feet to operate foot controls; who could never climb stairs or ramps but could occasionally balance on narrow, slippery, or erratic surfaces; and could occasionally stoop, but never kneel or crawl.  In addition, the individual was required to avoid workplace hazards.  The individual was able to remember, understand, and carry out simple and routine instructions and tasks consistent with unskilled jobs; and should have no interaction with the general public; and only occasional interaction with coworkers and supervisors after the first 30 days of employment.  (Tr. 66-67).  According to Ms. LaRue, such an individual would be unable to perform plaintiff's past work.  Other jobs were available in the national economy, such as document preparer, final assembler, and lens inserter.  (Tr. 71-72).  All work would be precluded if the individual were limited to occasional manipulation and fingering; was off-task 15 percent or more of an 8-hour workday; or had two or more unexcused absences in a month.  (Tr. 68-70).

**B.**     **Medical Evidence**

During the period under review, plaintiff received treatment for musculoskeletal pain from multiple specialists, including orthopedists and pain management specialists.  In addition, her cardiac and pulmonary functions were closely monitored after she developed pulmonary emboli and deep vein thrombosis.  She also received medical care to assist her with weight loss.  Her

primary care physicians treated her for multiple complaints, including GERD, shortness of breath, and pain.  Finally, she had regular management of psychiatric medications.

Plaintiff began treatment with primary care physician Leslie McCoy, D.O., in January 2015.  (Tr. 350-54).  Her primary complaint was back pain, but she also had depression, GERD, and anxiety.  She complained that she woke up several times per night and struggled with daytime sleepiness.  She had previously been diagnosed with fibromyalgia and had multiple body pains.  She had previously taken medication to treat fibromyalgia without much effect.  Plaintiff weighed 327 pounds and had a BMI of 51.  Dr. McCoy noted that plaintiff burst into tears several times during the appointment and that she ran out of time to complete an examination.  She prescribed omeprazole to treat plaintiff's GERD.  In April 2015, Dr. McCoy prescribed hydrocodone and Cymbalta for pain.  (Tr. 355-58).  Plaintiff was also taking the antidepressant amitriptyline, the anti-anxiety Ativan, and gabapentin.

In July 2015, plaintiff told Dr. McCoy that she had pain in her neck that caused itching and tingling all the way down her arm into her hand, with occasional pain in her shoulder.  (Tr. 359-62).  She felt lightheaded and had vertigo after going on carnival rides the previous week.  On examination, plaintiff had full range of motion of the neck with pain, and pain in her shoulder.  X-rays showed degenerative changes resulting in neural foraminal narrowing at C6-C7.  (Tr. 469).

Plaintiff had three orthopedic evaluations for shoulder and neck pain between August and November 2015.  (Tr. 336-38, 343-44, 339-42, 334-35).  Examination and imaging of her shoulder disclosed no abnormalities.  An MRI of her cervical spine showed severe neuroforaminal stenosis

at C7.  (Tr. 341).  Mohammad T. Agha, M.D., started plaintiff on Topamax and, in October 2015, she reported that her pain, numbness, and tingling had completely resolved.  (Tr. 334-35).

There is a gap in the medical records until August 29, 2016, when plaintiff sought emergency treatment for abdominal pain that was diagnosed as an ovarian cyst.  (Tr. 479-94).

In September 2016, Carol Greening, APRN, completed a psychiatric diagnostic evaluation of plaintiff.  (Tr. 423-30).  Plaintiff reported that she was diagnosed with bipolar disorder at age 19 after her daughter was born.  She reported difficulty with concentration and attention, poor motivation, and low energy.  She had difficulty falling and staying asleep.  She also had one or two panic attacks a month during which she feared she was having a heart attack because her heart raced.  Notably, she had no physical pain.  (Tr. 425 — "Pain is described as 0/10.")  Her mental status evaluation was normal with the exception of moderately depressed mood.  (Tr. 429).  She was diagnosed with Bipolar 2 disorder, panic disorder, and insomnia, all assessed as moderate in severity.  (Tr. 426).  Ms. Greening increased plaintiff's dose of Cymbalta and prescribed trazodone to be taken at bedtime.  At follow-up two weeks later, plaintiff reported that she was under a lot of stress and had been waking up at night and eating.  (Tr. 414-22).  She applied for jobs but was not called for interviews.  While her mood was variable, her energy and motivation were adequate.  Again, she reported that her pain level was 0 on a 10-point scale.  Ms. Greening again made alterations to plaintiff's medication.

 In October 2016, plaintiff was diagnosed with deep vein thrombosis in her left calf, bilateral pulmonary emboli, and mild right ventricular dilatation.  (Tr. 367-69, 370, 371-72, 464-74).  She reported that there was a family history of a bleeding disorder and genetic testing disclosed that she had the Factor V Leiden mutation.  (Tr. 475).  She started taking an anticoagulant

and was directed to modify her diet and increase her activity to include regular walking.  Plaintiff, who had smoked a half-pack of cigarettes a day for 15 years, quit smoking.  (Tr. 409).

In November 2016, plaintiff told orthopedist Dr. Agha that the pain in her neck and left arm had returned.  (Tr. 382-84).  On examination, she had full strength without atrophy, dystonia, or spasticity.  She had decreased left C7 reflex and some decreased range of motion of the neck.  A new MRI showed severe left and moderate right neural foraminal stenosis, similar to the prior MRI.  (Tr. 389-90).  Also in November, plaintiff sought emergency care for chest pain.  (Tr. 449-63).  She reported sharp pain that felt like something was sitting on her chest.  An examination, chest x-ray, and EKG were all unremarkable.  She was treated with analgesics and an anxiolytic and discharged.  She returned to the emergency room with similar symptoms two weeks later and was informed that she would continue to feel chest pain until her pulmonary emboli resolved.  (Tr. 432-38).

On November 8, 2016, Ms. Greening noted that plaintiff was mildly anxious about her "breathing issues" but felt that her depression was stable.  (Tr. 405-13).  Her pain was at level 0 on a 10-point scale.  She was sleeping well with Ambien and making good progress toward her goals and objectives.  In January 2017, plaintiff reported that she was mildly depressed but sleeping fairly well.  (Tr. 597-601).  She had panic attacks once or twice a month but did not have severe mood swings.  She denied having neck pain.  Ms. Greening noted that plaintiff needed a plan to take her medication regularly and to improve her ability to cope.  In February 2017, Ms. Greening noted that plaintiff's mood was variable and that she was not sleeping well.  (Tr. 592-96).  Ms. Greening directed plaintiff to speak to her primary care provider about a CPAP machine to address her sleep apnea.

9

On March 31, 2017, pulmonologist Humam Farah, M.D., noted that a chest x-ray showed that plaintiff's pulmonary emboli had resolved.  (Tr. 529-35).  Plaintiff's chest pain and shortness of breath were improving, but she still had leg pain.  A cardiac stress test showed no acute abnormality, while an echocardiogram showed a dilated right ventricle with reduced function.  An echocardiogram completed on July 28, 2017, disclosed a structurally normal heart without significant left ventricle dysfunction and no evidence of pulmonary hypertension.  (Tr. 715-16).  A repeat in April 2018 disclosed a mildly enlarged right ventricle with normal pressure.  (Tr. 700).  Over the course of the next year, Dr. Farah found that plaintiff's condition was generally stable and counseled her to lose weight and exercise.  (Tr. 743-50, 622-29, 646-54, 667-73, 682-88, 695-701, 728).  In November 2017, Dr. Farah referred plaintiff for a sleep study to evaluate her sleep apnea, noting that she had previously had a CPAP but it was removed because she was not compliant.  (Tr. 637-45).  In January 2018, Dr. Farah referred plaintiff for an upper endoscopy to address chest pain associated with eating.  (Tr. 672).  When completed in March, the test did not reveal any cause for chest pain but did show evidence of short-segment Barrett's esophagus, a frequent result of GERD. [3]  A confirmatory biopsy was not completed due to plaintiff's anticoagulant medication.  (Tr. 689-92).  An ultrasound showed hepatomegaly without focal mass and contracted gallbladder with mild wall thickening and without visible gallstones.  (Tr. 693-94).

In April 2017, Ms. Greening noted that plaintiff was not able to walk very far and had chest pain with exertion.  (Tr. 587-91).  Plaintiff was sleeping fairly well and described her mood as variable.  She had mild to moderate anxiety for which she took medication at least once a day.  Ms. Greening added high BMI to plaintiff's diagnoses and counseled her on exercise and diet.  Also in

---

[3] See https://www.medicinenet.com/barretts_esophagus/article.htm (last visited Apr. 22, 2020).

April 2017, Dr. McCoy wrote a note that plaintiff was limited to sedentary work due to multiple medical problems that prevented her from being physically active.  (Tr. 539).

On May 4, 2017, plaintiff told cardiologist Bassem Mikhail, M.D., that she had constant chest pain that radiated into her left arm and shoulder and occasional dizziness.  (Tr. 602-16).  It was Dr. Mikhail's opinion that plaintiff's chest pain related to her fibromyalgia.  (Tr. 605).  On examination, plaintiff was not in distress and had no redness, tenderness, or edema and had full strength.  An electrocardiogram showed normal sinus rhythm and she was assessed with right-sided dilatation due to pulmonary embolism.  Dr. Mikhail cleared her to undergo gastric bypass surgery if she elected to do so.  On May 18, 2017, plaintiff reported that her chest tightness occurred less frequently and was not as intense or bothersome.  (Tr. 729-34).

On June 21, 2017, plaintiff told Dr. McCoy that she had pain in her joints and muscles.  (Tr. 735-37).  Although she was tearful when talking about her pain, plaintiff was able to get off the examining table without difficulty.  Dr. McCoy referred plaintiff to pain management services because her conditions and medications made anti-inflammatory and opioid medications inadvisable.  X-rays of her hands, feet, and sacroiliac joints were all normal.  (Tr. 751-55).

Pain specialist Mian Rizwan, M.D., evaluated plaintiff on July 18, 2017.  (Tr. 756-61).  Plaintiff stated that she had had diffuse body pain for 10 years and that she hurt from head to toe but, more particularly, in her shoulder, neck, hips, back, knee, and hand, which occasionally got puffy.  Her pain was worse after exertion.  She had increased sensitivity to light and sound and always wore sunglasses.  She did not exercise due to shortness of breath and palpitations.  She reported that her sleep was poor but her depression symptoms were fairly stable.  On examination, she had 14 out of 18 fibromyalgia tender points.  It was Dr. Rizwan's assessment that multiple factors contributed to plaintiff's widespread arthralgia and myalgia, including poor sleep habits,

11

deconditioning, morbid obesity, untreated sleep apnea, and depression.  Dr. Rizwan suggested some medication changes and a sleep study to address insomnia, along with exercise and diet changes.

In August 2017, Ms. Greening reduced the frequency of the sleep aid Ambien to "as needed" after plaintiff reported that she was sleeping fairly well.  (Tr. 577-81).  Later that month, plaintiff reported that she had been unable to get out of bed after her back "locked up."  (Tr. 762-64).  She denied having radicular pain into her arms or legs.  On examination, she had normal range of motion of the cervical and lumbosacral spine without tenderness to palpation.  She was assessed with lumbago and neck pain and provided with five days of tramadol and 10 days of cyclobenzaprine.

On August 31, 2017, plaintiff entered into pain management treatment with Linh Thuy Nguyen, M.D.  (Tr. 810-12).  Plaintiff identified pain in her neck, back, and left hip as her primary concerns.  She reported that her psychiatric conditions were under control.  On examination, Dr. Nguyen noted that plaintiff was not in acute distress and had a normal gait.  She had asymmetry in her extremities but her calf was not swollen or tender.  Dr. Nguyen attributed plaintiff's pain to her morbid obesity which placed a lot of weight on her joints.  In order to avoid using opioid medications, Dr. Nguyen planned to assist plaintiff with weight loss through healthy eating.  Plaintiff's gabapentin was increased to the maximum therapeutic dose and she was placed on tramadol and Flexeril as needed for pain.  In October 2017, Dr. Nguyen noted that plaintiff's pain had not improved with the medication changes and that she had actually gained weight.  (Tr. 813-14).  Dr. Nguyen reviewed healthy eating and portion control and agreed to provide the opioid Lortab for four weeks, to be used sparingly when plaintiff exercised or exerted herself.

On October 26, 2017, plaintiff was evaluated by Priscilla Long M.D., at a weight and wellness clinic. (Tr. 630-36). Plaintiff reported that she got up two or three times a night to eat. Dr. Long recommended medication changes to help with weight and insomnia. Plaintiff had decided not to have gastric bypass surgery, so Dr. Long prescribed diet and exercises and referred her for a CPAP machine which she obtained in January 2018, after a sleep study showed she had moderate obstructive sleep apnea. (Tr. 717-19, 720-23). According to automated compliance reports in February and April 2018, she used the machine consistently. (Tr. 724, 727). Despite the CPAP, in March 2018, plaintiff told Ms. Greening that her daytime sleepiness and energy levels had not improved. (Tr. 560-65).

In December 2017, Dr. Long noted that plaintiff's binge eating had improved and she was using Therabands to exercise. (Tr. 655-56). Although she had lost four pounds, her muscle mass had decreased and her waist circumference had not decreased. Dr. Long directed plaintiff to use a phone app to document her consumption.

In January 2018, Dr. Nguyen noted that plaintiff had again gained weight. (Tr. 815-16). In addition, plaintiff failed to notify Dr. Nguyen after receiving pain medication on an emergency basis for blood clots.[4] Dr. Nguyen switched plaintiff from gabapentin to Lyrica and warned her that she would discontinue the pain medications if plaintiff did not make progress on losing weight. Dr. Long noted that plaintiff was only eating an evening meal and not using the apps to record consumption. (Tr. 665-66). She instructed plaintiff to get up earlier and eat breakfast and lunch. In March 2018, Dr. Nguyen increased plaintiff's Lyrica, after noting that she was still in pain. (Tr. 689-92).

---

[4] This episode does not appear in the administrative transcript.

Plaintiff began treatment with John Greving, D.O., in late March 2018.  (Tr. 786-90).  She reported that she had daily pain in her cervical spine, pain in the epigastric area and upper right quadrant that was worse with eating, and chest pain with shortness of breath.  She was described as a light smoker.  (Tr. 787).  Despite her presenting complaints, on review of systems she reported that she felt well.  On physical examination, she had normal excursion with symmetric chest walls; quiet, even and easy respiratory effort with no use of accessory muscles; and normal breath sounds. An x-ray of the abdomen was negative while an x-ray of the cervical spine showed mild degenerative disc disease.  Plaintiff was advised to stop eating fatty foods, do home exercises for the cervical spine, and apply a heating pad to her neck.  Dr. Greving increased the dosage of omeprazole, stopped Flexeril, and prescribed tramadol.

On April 10, 2018, plaintiff told Dr. Nguyen that her pain was "horrible."  (Tr. 819-20). She had gained six pounds.  On May 22, 2018, plaintiff told Patricia Hirner, M.D., that she had epigastric and right-sided abdominal pain, but her biggest concern was diarrhea which she had been experiencing for three years.  (Tr. 702-5).  Tests for celiac disease were negative.  (Tr. 713-14).  Plaintiff was prescribed Questran.[5]

MRIs completed on May 24, 2018, showed mild to moderate degenerative disc disease throughout the cervical spine with suspected impingement of the left C7 nerve root and borderline left canal stenosis.  (Tr. 794).  In addition, the L5-S1 disc was herniated.  Her mild degenerative disc disease and facet arthrosis at L1 through L5 were unchanged from prior studies.

In June 2018, Dr. Nguyen noted that plaintiff was very resistant to making any changes or admissions regarding her weight and that there was little that could be done for her if she did not

---

[5] Questran is used to lower high levels of cholesterol in the blood and to treat itching caused by a blockage in the bile ducts of the gallbladder.  See https://www.drugs.com/mtm/questran.html (last visited Apr. 22, 2020).

want to change her lifestyle.  (Tr. 821-22).  Later that month, plaintiff told Dr. Greving that her epigastric pain had improved with the increased omeprazole.  (Tr. 769-77).  She continued to experience pain in her neck and low back, with weakness in her left arm and tingling and numbing in her calf.  On review of systems, plaintiff apparently felt well and did not have neck pain, anxiety, or depression.  She did endorse fatigue, headache, gastrointestinal symptoms, back and joint pain, and tingling and numbing.  Her examination was unremarkable.  In early July 2018, plaintiff told Ms. Greening that she was more depressed and had felt suicidal to the extent that she cut her arm with a knife, something she had never done before.  (Tr. 547-53).  Ms. Greening noted that plaintiff had been off all her medications for about two weeks at the time of this episode  and was no longer suicidal.

### C.    <u>Opinion Evidence</u>

On January 10, 2017, State agency psychological consultant Raphael Smith, Psy.D., completed a Psychiatric Review Technique form based on a review of plaintiff's medical record through November 2016.  (Tr. 77-79, 89-91).  Dr. Smith concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.06 (anxiety disorders), but that they were not severe.  Dr. Smith opined that plaintiff had mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  After considering the entire medical record and plaintiff's testimony, the ALJ gave Dr. Smith's opinion little weight.  (Tr. 19-20).

As noted above, on April 19, 2017, Dr. McCoy, plaintiff's treating physician, stated that plaintiff was able to perform sedentary community service but could not be involved in anything

that would require her to go outside or be physically active.  Dr. McCoy was unable to say how long these restrictions would be in force.  The ALJ found that Dr. McCoy's opinion was generally consistent with the totality of the evidence and gave the opinion great weight.  (Tr. 19).  Plaintiff does not challenge the ALJ's assessment of Dr. McCoy's opinion.

On November 27, 2018, plaintiff underwent a psychological assessment with Frank Froman, Ed.D.  (Tr. 851-54).  She reported having panic attacks and isolating herself.  She also stated that she was dyslexic but had hidden it.  Although she was unaware of recent news, she correctly identified four recent presidents and named five big cities.  She was able to do simple addition, subtraction, and multiplication and perform serial 7's.  She could recall five digits forward and two digits backward.  Dr. Froman estimated plaintiff's I.Q. in the low average to average range.  He described her as "retreat[ing] defensively into a limited life space," with panic attacks when she "emerg[d] from her 'safe cocoon.'"  (Tr. 853).   She tended to be avoidant of others and was frustrated by her chronic pain.  She had not had "effective psychotherapy which might enable her to deal with any of her symptoms."  Id.  Dr. Froman diagnosed plaintiff with panic disorder with encroaching agoraphobia, history of dyslexia, and personality disorder with avoidant and depressive traits.  He concluded that it would be difficult for plaintiff to perform one- and two-step assemblies at a competitive rate.  She was able to relate to others, understand oral and written instructions, and manage benefits.  Although her physical issues would make it difficult to withstand the stresses associated with customary employment, she could "likely handle" such stresses from a psychological viewpoint.  Id.

Dr. Froman also completed a medical statement of abilities to do work-related activities.  (Tr. 845-46).  Noting that plaintiff's "modest I.Q. lower[ed her] ability to make higher level decisions," he opined that plaintiff had no limitations in her abilities to understand, remember, and

carry out simple instructions and make judgments on simple work-related decisions; moderate limitation in her ability to understand and remember complex instructions; and marked limitations in her abilities to carry out complex instructions and make judgments on complex work-related decisions.  Dr. Froman also opined that, due to her panic disorder and difficulty socializing, plaintiff was moderately limited in her abilities to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to usual work situations and changes in a routine work setting.  The ALJ gave considerable weight to Dr. Froman's assessment that plaintiff's mental illness limited her to unskilled work with restrictions on her interactions with others.  (Tr. 20).  The ALJ also found, however, that Dr. Froman's opinion that plaintiff would find it difficult to perform one- and two-step assemblies at a competitive rate was inconsistent with his opinion that she could understand, remember, and carry out simple instructions and make judgments on simple-work place decisions.  This internal inconsistency "undermines the overall reliability of Dr. Froman's opinion."  Id.  Plaintiff does not challenge the ALJ's assessment of Dr. Froman's opinion.

On November 29, 2018, plaintiff underwent a consultative examination with Adam Samaritoni, D.O.  (Tr. 824-29).  On examination, plaintiff had pain at all 18 fibromyalgia points.  Her grip was strong and she had full range of motion and no sensory loss in her hands.  She had "a bit of a limited range of motion" in both shoulders.  (Tr. 828).  Although she had some sensory abnormalities in her lower extremities, she had no atrophy in the legs or effusion in the knees.  She had some muscle spasm with marked discomfort at the lumbar spine, but straight leg raises were negative.  Her gait was slow and steady.  (Tr. 829).  Dr. Samaritoni also completed a medical source statement, "based on patient's report."  (Tr. 835-43).  He opined that plaintiff could occasionally lift and carry up to 20 pounds but never more.  She could sit for five hours, stand for

one hour, and walk for one hour in an eight-hour day.  She could occasionally reach overhead, handle, finger, feel, and push/pull, and could frequently use foot controls.  She could occasionally climb stairs and ramps, balance, stoop, kneel, and crawl, but never crouch.  She could never be exposed to unprotected heights or moving mechanical parts, but could tolerate occasional exposure to environmental factors such as temperature extremes.  She could not travel without a companion to offer assistance, walk a block at a reasonable pace on an uneven surface, use public transportation, or climb a few steps at a reasonable pace without a handrail.  The ALJ gave Dr. Samaritoni's opinion no weight because it was based on plaintiff's report, rather than objective medical findings or a review of plaintiff's medical records.  (Tr. 19).  Plaintiff does not address the ALJ's assessment of Dr. Samaritoni's opinion.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary

sufficiency is not high." Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

# IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 10-23).  The ALJ found that plaintiff met the insured status requirements through June 30, 2020, and had not engaged in substantial gainful activity since August 4, 2015, the amended alleged onset date.  (Tr. 13).  At step two, the ALJ found that plaintiff had the severe impairments of fibromyalgia, bilateral pulmonary embolism, deep vein thrombosis, Factor V Leiden mutation, sleep apnea, disorder of the cervical and lumbar spine, obesity, bipolar disorder, panic disorder with encroaching agoraphobia, and personality disorder with avoidant and depressive traits.  Id. The ALJ analyzed plaintiff's medically determinable mental impairments[6] under the paragraph B criteria (20 C.F.R., Part 404, Subpart P, Appx. 1) and determined that plaintiff had moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. 14-15).  Plaintiff does not challenge the ALJ's assessment of her severe impairments or paragraph B determination.  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment, and specifically addressed listing 1.04 — disorders of the spine.  (Tr. 14).  Plaintiff argues that the ALJ improperly concluded that her impairments do not meet or equal this listing.

The ALJ next determined that plaintiff had the RFC to perform sedentary work, except that she could never push/pull with her arms, reach overhead, or use foot controls.  She also could never climb ladders, ropes, scaffolds, ramps, or stairs.  She could occasionally stoop, crouch and balance on narrow, slippery, or erratically moving surfaces, but never kneel or crawl.  She could frequently handle, finger, and feel.  She should avoid all exposure to unshielded moving

---

[6] The ALJ considered listings 12.04 (affective disorders), 12.06 (anxiety disorders), and 12.08 (personality disorders).

mechanical parts and hazardous machinery and should not drive as part of her work. She was able to understand, remember, and carry out simple and routine instructions and tasks consistent with unskilled jobs.[7] She could have no interaction with the general public and only occasional interaction with coworkers and supervisors after the first 30 days of employment. (Tr. 15-16). In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff and her mother; and plaintiff's testimony regarding her abilities, conditions, and activities of daily living. (Tr. 16-21). While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence, and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 17-18). In support, the ALJ cited plaintiff's activities of daily living, including going out with friends, going on rides at a carnival, and applying for jobs. In addition, the ALJ found that plaintiff's subjective complaints were out of proportion to the objective medical evidence, medical opinions, and the record as a whole. Plaintiff argues that the ALJ improperly concluded that she has the RFC to perform sedentary work.

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work. (Tr. 21). Her age on the alleged onset date placed her in the "younger individual" category. She had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not she had transferable job skills. The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial

---

[7]The ALJ specified that plaintiff could work at jobs with a Specific Vocational Preparation level of 1 or 2.

numbers in the national economy, namely as a document preparer, final assembler, and lens

inserter.  (Tr. 21-22).  Thus, the ALJ found that plaintiff was not disabled within the meaning of

the Social Security Act from August 4, 2015 through February 25, 2019 — the date of the decision.

(Tr. 22-23).

## V.  Discussion

Plaintiff argues that the ALJ erred in determining that plaintiff's spinal impairments do not

satisfy listing 1.04; that the ALJ incorrectly determined that plaintiff has the RFC to perform

sedentary work; and the ALJ improperly failed to consider the State agency physicians' findings

that plaintiff is disabled.

### A.    Listing 1.04

"To meet a listing, a claimant must show that he or she meets all of the criteria for the listed

impairment."  Blackburn v. Colvin, 461 F.3d 853, 858 (8th Cir. 2014).  "Merely being diagnosed

with a condition named in a listing and meeting some of the criteria will not qualify a claimant for

presumptive disability under the listing."  McCoy v. Astrue, 648 F.3d 605, 611–12 (8th Cir. 2011).

The claimant bears the burden of establishing that she meets all the criteria of the relevant listing.

Blackburn, 761 F.3d at 858.

Plaintiff asserts that she meets listing 1.04A,[8] which defines musculoskeletal spinal

impairments as:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
> stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),

---

[8] A claimant can meet listing 1.04 by showing (A) "evidence of nerve root compression," (B) "spinal arachnoiditis, or (C) "lumbar spinal stenosis."  Plaintiff does not identify which component of the listing she claims to satisfy, but her arguments make it clear that she claims to have nerve root compression.

resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A).

The requisite level of severity "is only met when all of the medical criteria listed . . . are simultaneously present." Social Security Acquiescence Ruling (AR) 15–1(4), Radford v. Colvin: Standard for Meeting the Listing for Disorders of the Spine With Evidence of Nerve Root Compression, 80 Fed. Reg. 57418–02, 57420 (Sept. 23, 2015) (found at 2015 WL 5697481); see also Sharpton v. Berryhill, No. 16-CV-1938 (TNL), 2017 WL 4277143, at *3 (D. Minn. Sept. 25, 2017) (applying AR 15–1(4)); Banks v. Colvin, No. 15–cv–01040–CJW, 2017 WL 382239, at *6 (N.D. Ia. Jan. 26, 2017) (same). Thus, "when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression w[ill] not rise to the level of severity required by listing 1.04A." AR 15–1(4), 2015 WL 5697481 at *4.

The ALJ found that plaintiff had disorders of the cervical and lumbar spine as required to meet the listing's first requirement. (Tr. 13). With respect to the paragraph A requirements, however, multiple physical examinations throughout the period under review showed that plaintiff had normal strength, normal reflexes, equal grip strength, normal range of motion in most joints, no sensory or motor deficits, and normal gait. (Tr. 17, 335, 344, 361, 378, 433-34, 468, 481, 532, 608, 625, 641, 650, 670, 685, 698, 746, 773, 781, 788). Thus, plaintiff cannot establish that she met all the medical requirements for listing 1.04A.

### B.     RFC Determination

Plaintiff argues that the ALJ erred in determining that she could perform the full range of sedentary work.  Plaintiff also argues that the ALJ erred in determining that she was capable of bending or stooping.  The Court construes these arguments as challenges to the ALJ's RFC determination.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Nonetheless, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all.  See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions).  Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  The ALJ may also consider a claimant's daily activities, subjective allegations, and any other evidence of record when developing the RFC.  Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495

F.3d at 619-20).  And, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006).  The burden is on the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523.

Plaintiff's assertion that the ALJ found she was capable of the full range of sedentary work is simply incorrect.  The ALJ actually found that plaintiff was limited to "less than the full range of sedentary work."  (Tr. 21).  As the ALJ noted, if plaintiff had the RFC to perform the full range of sedentary work, a finding of not disabled would be directed by the Medical-Vocational Rule 201.28.   "However, [plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations," and thus the ALJ relied on the testimony of the vocational expert to determine whether jobs existed for an individual with plaintiff's age, education, work experience, and RFC.  (Tr. 22).

Plaintiff also argues that the ALJ erred in finding that she was able to occasionally stoop, asserting that the "unrebutted evidence" establishes that she cannot "bend [or stoop]."  Pl. Brief at 6 (alteration in original).  Although plaintiff testified that she had trouble bending over (Tr. 50), there are no objective medical findings that she was incapable of occasional stooping and no medical provider ever precluded her from doing so.  Indeed, consultative examiner Dr. Samaritoni concluded that plaintiff was capable of occasional stooping, based on plaintiff's own report.  (Tr. 838).

The ALJ's RFC determination is supported by substantial evidence in the record.

**C.   Opinions of State Agency Physicians**

Plaintiff asserts, without citation to the record, that the State agency medical consultant specifically opined that claimant's symptoms were "fully credible."  She further asserts that the

ALJ incorrectly denied the opinion of this medical consultant, again without citing the relevant portion of the ALJ's decision.

The initial state agency determinations were made by Erin LePage — a Single Decision Maker — and psychologist Dr. Raphael Smith.  Ms. LePage explicitly found that plaintiff's statements regarding her symptoms were "partially consistent" with the other evidence in the record and, further, that plaintiff had the RFC to perform sedentary work with additional exertional and postural restrictions.  (Tr. 79-81, 91-93).  And, Dr. Smith found that plaintiff did <u>not</u> have a severe mental impairment, a conclusion the ALJ rejected.  Thus, no State agency examiner determined that plaintiff's allegations were fully credible.  In the event that plaintiff relies on the opinion of consultative examiner Dr. Samaritoni and consultative psychologist Dr. Froman, neither opined that her allegations were "fully credible."

The ALJ concluded that plaintiff's subjective allegations were inconsistent with her own activities and the medical record.  (Tr. 17).  An ALJ may properly discount subjective reports based on inconsistencies between those reports and daily activities and medical evidence.  <u>Vance v. Berryhill</u>, 860 F.3d 1114, 1120-21 (8th Cir. 2017).  The ALJ also considered Dr. Nguyen's observation that plaintiff was not motivated to follow treatment recommendations to lose weight and exercise rather than relying on pain medication.  (Tr. 17).  An ALJ may properly consider a claimant's failure to follow treatment recommendations in assessing her subjective allegations.  <u>See</u> <u>Choate v. Barnhart</u>, 457 F.3d 865, 872 (8th Cir. 2006).

The ALJ's evaluation of plaintiff's subjective complaints is supported by substantial evidence in the record as a whole.

* * * * *

27

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.


/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of May, 2020.